**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| JESSICA THOMPSON, on behalf of themselves and all other similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>RECKITT BENCKISER, LLC,<br><br>Defendant. | Case No. 2:23-cv-1606<br><br>**COMPLAINT CLASS ACTION**<br><br>**JURY DEMAND** |

**CLASS ACTION COMPLAINT**

Jessica Thompson ("Plaintiff"), on behalf of herself and all others similarly situated, file this Class Action Complaint ("CAC") against Defendant Reckitt Benckiser, LLC ("Reckitt" or "Defendant") support states the following:

**NATURE OF THE ACTION**

1. This is a class action lawsuit brought under Washington's consumer protection laws by Plaintiff, and others similarly situated, who purchased products from the following over-the-counter ("OTC") decongestant product line containing phenylephrine: Mucinex Nightshift Sinus and similar products containing oral phenylephrine. These Products are manufactured, sold, and distributed by Defendant and have been found by the U.S. Food and Drug

1

Administration ("FDA") to lack efficacy. The Product's lack of efficacy was not disclosed to Plaintiff prior to Plaintiff's purchase of the Product and Plaintiff would not have purchased the Product had she known it did not work as advertised. Plaintiff and the putative class suffered economic damages due to Defendant's misconduct (as set forth below) and they seek injunctive relief and restitution for the full purchase price of the Products they purchased. Plaintiff alleges the following based upon personal knowledge as well as investigation by counsel, and as to all other matters, upon information and belief. Plaintiff further believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

2. This Court has original jurisdiction pursuant to 28 U.S.C. §1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are in excess of 100 class members and Plaintiff is a citizen of a state different from Defendant.

3. This Court has jurisdiction over Defendant because Defendant is authorized to conduct and do business in Washington. Defendant has marketed, promoted, distributed, and sold the Products in Washington and Defendant has sufficient minimum contacts with this State and/or sufficiently avail themselves of the markets in this State through promotion, sales, distribution, and marketing within this State to render the exercise of jurisdiction by this Court permissible.

4. Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) and (b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred while she resided in this judicial district. Venue is also proper under 18 U.S.C. §1965(a) because Defendant transacts substantial business in this District.

## THE PARTIES

5. Plaintiff Jessica Thompson is a citizen and resident of Washington and at all times

1  relevant hereto, has been a resident of Washington. Within the class period defined below, Plaintiff
2  purchased Mucinex Nightshift Sinus in Washington. During that time, based on the false and
3  misleading claims by Defendant, Plaintiff was unaware that Defendant's Product was not an
4  effective remedy for congestion and/or cold symptoms. Plaintiff purchased Defendant's Product
5  on the assumption that the marketing of the Product was accurate, and that the Product worked as
6  advertised. Plaintiff would not have purchased Defendant's Product had she known it was not
7  effective and lacked efficacy. As a result, Plaintiff suffered injury in fact when she spent money
8  to purchase a Product she would not otherwise have purchased absent Defendant's misconduct, as
9  alleged herein.

10      6.    Defendant Reckitt Benckiser, LLC, is a Delaware limited liability company with
11  headquarters and principal place of business in Parsippany, New Jersey. Reckitt manufactures
12  markets, advertises, distributes, and sells Mucinex Nightshift Sinus as well as other oral
13  phenylephrine products.

### SERVICE ON ATTORNEY GENERAL

15      7.    Counsel for Plaintiff have caused a copy of this initial pleading to be served on
16  the Attorney General of Washington in accordance with RCW 19.186.095.

### INTRODUCTION

18      8.    Defendant, Reckitt, is a corporation engaged in the manufacture, marketing, and
19  sale of various OTC pharmaceutical products, including Mucinex Nightshift Sinus and similar
20  oral phenylephrine products.

21      9.    Defendant marketed and sold the Products to consumers in Washington and
22  across the United States as an effective nasal decongestant.

23      10.    The main active ingredient in the Products is phenylephrine hydrochloride, or
24  "PE." In 1994, the FDA issued a final monograph establishing conditions under which OTC

nasal decongestant drug products are generally recognized as safe and effective ("GRASE") and not misbranded. Phenylephrine is included in the final monograph as an OTC oral nasal decongestant. Defendant marketed PE as an effective decongestant that should be used to relieve nasal congestion and sinus pressure associated with colds, allergies, and other respiratory conditions.

11.  According to Defendant, phenylephrine works by constricting blood vessels in the nasal passages, which reduces swelling and congestion.

12.  Over the years, Defendant made the following claims in their marketing, advertising, and promotional materials concerning the efficacy of their Products,

13.  For example, Mucinex Nightshift Sinus includes these marketing claims:

- Starts to Break Up Sinus Symptoms with Just 1 Dose or your money back.

- Clears Nasal Decongestion (Phenylephrine HCI 10 mg).

- Sometimes, when you're sick, you're really sick. Nasal congestion, sore throat, runny nose, fever, headache, cough - you name it, you've got it. Mucinex Nightshift Sinus has your back to fight your worst nighttime cold & flu symptoms.



14. In 2007, the consumer advocacy group Public Citizen filed a petition with the U.S. Food and Drug Administration (FDA) regarding phenylephrine. The petition requested that the FDA re-evaluate the safety and efficacy of phenylephrine as a nasal decongestant and take regulatory action.

---

[1] Amazon: Mucinex Nightshift Sinus (https://www.amazon.com/Nightshift-Relieves-Sneezing-Congestion-Controls/dp/B07VSVC1C7).

[2] Amazon: Mucinex Nightshift Sinus (https://www.amazon.com/Mucinex-Strength-Sinus-Max-Nightshift-Multi-Symptom/dp/B094XJF8T8).

15. Public Citizen expressed concerns that phenylephrine, the active ingredient in many OTC decongestant products, was not as effective as another decongestant called pseudoephedrine.

16. The petition argued that the switch from pseudoephedrine to phenylephrine in many cold and allergy medications had not been supported by adequate scientific evidence demonstrating the latter's effectiveness in relieving nasal congestion.

17. Public Citizen also raised concerns about the potential side effects and safety of phenylephrine, suggesting that its use might lead to increased blood pressure in some individuals.

18. The FDA reviewed the concerns raised by the Public Citizen petition regarding the safety and efficacy of phenylephrine as a nasal decongestant. The FDA concluded that, based on the available data at the time of its review in 2007, phenylephrine could be considered effective as a nasal decongestant when used at the recommended doses.

19. Thus, in 2007, the FDA concluded that orally administered PE was Generally Recognized as Safe and Effective (GRASE).

20. The FDA's GRASE determination allowed Defendant to market the Products as an OTC or "over-the-counter" medication. This was an important designation to Defendant as it allowed them to market the Products to consumers without requiring a doctor's prescription, making it more accessible for self-treatment, and allowing Defendant to make billions of dollars in OTC sales.

21. However, on September 11th and 12th, 2023, the FDA issued a new report detailing its updated review of the efficacy of phenylephrine, based on the studies it initially reviewed in 2007 and additional studies obtained since its initial review. A copy of the FDA's report is attached as Exhibit A.

1    22.    The FDA's findings are based on rigorous scientific research and evaluation.

2    23.    At its initial 2007 Nonprescription Drugs Advisory Committee ("NDAC") meeting and review, the FDA reviewed clinical effectiveness data for oral doses between 5mg and 40mg in a total of 14 studies, of which 7 reported positive measurable efficacy results.

24.    In its re-analysis of these studies in 2023, the FDA found significant problems:

> [w]hen considering the studies through a modern drug review lens, all of the studies (both positive and negative) were highly problematic in both design and methodology. All used a highly variable endpoint (NAR) to study a drug in the setting of a highly variable disease state (the common cold) that is no longer used as a primary endpoint to evaluate congestion in pivotal trials.[3] Further, all the positive studies (and most of the negative studies) were unpublished and therefore never peer-reviewed. Six of the seven positive studies came from a single study center (funded by the manufacturer of Neo-Synephrine), were very small in size, and (except in one instance) the results could not be duplicated at two other study centers (also funded by the same manufacturer) that used a similar study design and methodology. (emphasis added).

Exhibit A.

25.    The FDA thus found that the original studies had data integrity issues and that the results from the Elizabeth study site, a study it relied on in 2007, could not be duplicated in at least two other Sterling-Winthrop study sites that used a similar study design and methodology.

26.    As noted in the FDA's re-evaluation of the data, the original studies used to support the GRASE determination in 2007 were based on "equivocal findings." Exhibit A. Indeed, there were "significant deficiencies" in the "design and conduct of these studies." *Id*.

---

[3] The FDA's Guidance for Industry on Developing Drug Products for Treatment of Allergic Rhinitis recommends use of symptom scores for the primary endpoint in clinical trials. *See* FDA, 2018, Guidance for Industry; Allergic Rhinitis: Developing Drug Products for Treatment, https://www.fda.gov/regulatory-information/search-fda-guidance-documents/allergic-rhinitis-developing-drugproducts-treatment-guidance-industry (hereafter "FDA Guidance for Industry (2018)").

27.     In light of the methodological and design flaws it found, the FDA now believes that "the original studies evaluated for efficacy" are "unacceptable as continued support for the efficacy of monographed doses or oral PE." Exhibit A.

28.     Since 2007, several additional large clinical trials have been conducted regarding the efficacy of phenylephrine.[4] Those studies provide evidence of the absence of a decongestant effect from the OTC approved doses of 10 mg.

29.     For example, Horak et al (2009) found that PE was not significantly different from placebo in the mean change in subjective nasal congestion scores whereas pseudoephedrine, a positive control in the study, decreased congestion significantly greater than placebo and PE.

30.     Day et al (2009) similarly reported no difference between PE and placebo with respect to decreased nasal congestion scores.

31.     Gelotte and Zimmerman (2015) likewise reported a lack of local decongestion effect of PE, finding that doses up to three times the labeled OTC for oral phenylephrine are unlikely to be effective as a nasal decongestant.

---

[4] See, e.g., Gelotte, CK and BA Zimmerman, 2015, Pharmacokinetics, safety, and cardiovascular tolerability of phenylephrine HCl 10, 20, and 30 mg after a single oral administration in healthy volunteers, Clin Drug Investig, 35(9):547-558; Day, JH, MP Briscoe, JD Ratz, M Danzig, and R Yao, 2009, Efficacy of loratadine-montelukast on nasal congestion in patients with seasonal allergic rhinitis in an environmental exposure unit, Ann Allergy Asthma Immunol, 102(4):328-338; Horak, F, P Zieglmayer, R Zieglmayer, P Lemell, R Yao, H Staudinger, and M Danzig, 2009, A placebo-controlled study of the nasal decongestant effect of phenylephrine and pseudoephedrine in the Vienna Challenge Chamber, Ann Allergy Asthma Immunol, 102(2):116-120; Meltzer, EO, PH Ratner, and T McGraw, 2015, Oral phenylephrine HCl for nasal congestion in seasonal allergic rhinitis: A randomized, open-label, placebo-controlled study, J Allergy Clin Immunol Pract, 3(5):702-708; Meltzer, EO, PH Ratner, and T McGraw, 2016, Phenylephrine hydrochloride modified-release tablets for nasal congestion: a randomized, placebo-controlled trial in allergic rhinitis patients, Ann Allergy Asthma Immunol, 116(1):66-71.

32. Thus, the results of several studies reported after the initial efficacy determination of the Products in 2007 clearly demonstrate that PE is no more effective than placebo in decreasing nasal congestion and, thus, lacks efficacy.

33. On September 12, 2023, an FDA panel unanimously declared that phenylephrine, the active ingredient in the Products, is an ineffective decongestant.

34. As of 2007, nasal airway resistance ("NAR") was the principle methodology used to assess the effectiveness of oral PE. This methodology used measurements of airflow and air pressure in the nasal passage to calculate NAR as an indirect measure of the level of nasal congestion.

35. In 2018, however, the FDA issued new guidance for industry as it related to the use of nasal congestion symptom scores to evaluate congestion,[5] meaning that NAR was no longer used as a primary endpoint to evaluate congestion in studies.

36. Based on the FDA's new 2018 guidance, Defendant knew or should have known that their marketing claims regarding the Products' efficacy were false and misleading. This is because the primary endpoint for evaluating the efficacy of the Products had changed since the FDA's 2007 NDAC meeting, meaning that the previous data under which the Products were approved as GRASE no longer supported efficacy. There have been no published studies since the FDA's revised 2018 guidance for industry was released that demonstrate the effectiveness of oral phenylephrine as a decongestant. Accordingly, Defendant knew or should have known by at least 2018 that their marketing claims regarding the Products' efficacy were false and misleading.

---

[5] FDA Guidance for Industry (2018).

37. Plaintiff and the class members purchased the Products in reliance on Defendant's false and deceptive marketing claims.

38. As a result of Defendant's false and deceptive marketing, Plaintiff and the class members suffered economic damages, including the cost of purchasing the Products.

## CLASS ALLEGATIONS

39. Plaintiff brings this action on behalf of herself and all other similarly situated class members (the "Class" or "Classes") pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and seeks certification of the following Class against Defendant for violations of Washington state laws and/or similar laws in other states:

**Multi-State Class Action**

All consumers who purchased Mucinex Nightshift Sinus Products in the United States of America and its territories from October 19, 2018 to the present for personal use or consumption.

Excluded from the Class are individuals who allege personal bodily injury resulting from the use of Mucinex Nightshift Sinus. Also excluded from this Class are Defendant, any parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, employees, co-conspirators, all governmental entities, and any judge, justice or judicial officer presiding over this matter.

40. In the alternative, Plaintiff brings this action on behalf of herself and all other similarly situated Washington consumers pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and seeks certification of the following Sub-Classes:

**Washington Sub-Class**

All consumers who purchased Mucinex Nightshift Sinus Products in the State of Washington from October 19, 2018 to the present for personal use or consumption.

Excluded from the Class are individuals who allege personal bodily injury resulting from the use of Mucinex Nightshift Sinus Products. Also excluded from this Class are Defendant, any parent

companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, employees, co-conspirators, all governmental entities, and any judge, justice or judicial officer presiding over this matter.

41. The members of the Class are so numerous that joinder of all members of the Class is impracticable. Plaintiff is informed and believes that the proposed Class/Sub-Classes contains thousands of purchasers of Defendant's Products who have been damaged by Defendant's conduct as alleged herein. The precise number of Class members is unknown to Plaintiff at this time.

42. Plaintiff's claims are typical to those of all Class members because members of the Class are similarly injured through Defendant's uniform misconduct described above and were subject to Defendant's deceptive marketing claims that accompanied each and every Product. Plaintiff is advancing the same claims and legal theories on behalf of themselves and all members of the Class/Sub-Class.

43. Plaintiff's claims raise questions of law and fact common to all members of the Class, and they predominate over any questions affecting only individual Class members. The claims of Plaintiff and all prospective Class members involve the same alleged defect. These common legal and factual questions include the following:

 (a) whether Defendant's Products contained phenylephrine;

 (b) whether Defendant's marketing statements are false, misleading, or objectively reasonably likely to deceive;

 (c) whether the alleged conduct constitutes violations of the laws asserted;

 (d) whether Defendant's alleged conduct violates public policy;

 (e) whether Defendant engaged in false or misleading advertising;

 (f) whether Defendant was unjustly enriched as a result of its marketing,

     advertising and/or selling of the Products;

 (g) whether Plaintiff and the Class members are entitled to damages and/or restitution and the proper measure of that loss; and

 (h) whether an injunction is necessary to prevent Defendant from continuing to market and sell Products that lack efficacy.

44. Plaintiff and her counsel will fairly and adequately protect and represent the interests of each member of the class. Plaintiff has retained counsel experienced in complex litigation and class actions. Plaintiff's counsel has successfully litigated other class action cases similar to that here and have the resources and abilities to fully litigate and protect the interests of the class. Plaintiff intends to prosecute this claim vigorously. Plaintiff has no adverse or antagonistic interests to those of the Class, nor is Plaintiff subject to any unique defenses.

45. A class action is superior to the other available methods for a fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by the Plaintiff and individual Class members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant. It would thus be virtually impossible for Plaintiff and Class members, on an individual basis, to obtain meaningful and effective redress for the wrongs done to them. Further, it is desirable to concentrate the litigation of the Class members' claims in one forum, as it will conserve party and judicial resources and facilitate the consistency of adjudications. Plaintiff knows of no difficulty that would be encountered in the management of this case that would preclude its maintenance as a class action.

46. The Class also may be certified because Defendant has acted or refused to act on grounds applicable to the Class, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

47. Plaintiff seeks preliminary and permanent injunctive and equitable relief on behalf of the entire Class, on grounds generally applicable to the entire Class, to enjoin and prevent Defendant from engaging in the acts described above, such as continuing to market and sell Products that lack efficacy and requiring Defendant to provide a full refund of the purchase price of the Products to Plaintiff and Class members.

48. Unless a Class is certified, Defendant will retain monies received as a result of their conduct that were taken from Plaintiff and the Class members. Unless a Class-wide injunction is issued, Defendant will continue to commit the violations alleged and the members of the Class and the general public will continue to be misled. Indeed, to this day, Defendant continues to market and sell the Products that have been determined by a unanimous FDA panel to lack efficacy.

### FIRST CAUSE OF ACTION

**Violation of Washington's Consumer Protection Act (RCW 19.86)**
**(Unfair Business Practices)**

**(On Behalf of the Plaintiff and the Washington Sub-Class Against Defendant)**

49. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

50. Plaintiff brings this Count individually and on behalf of the Washington Sub-Class.

51. Washington's Consumer Protection Act ("CPA") provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful" and prohibits "an unfair or deceptive act or practice, occurring in trade or commerce, with a public interest impact, that causes injury." RCW § 19.86.020.

52. The purpose of CPA is to "protect the public and foster fair and honest competition". RCW § 19.86.090.

53. Private consumers may bring a civil action to enforce violations of the Consumer Protection Act to enjoin further violations, to recover actual damages, or both together with the costs and attorney's fees. RCW § 19.86.090.

54. Under the CPA, when an unfair or deceptive act or practice is alleged under RCW § 19.86.020, a claimant may establish that the act or practice is injurious to the public interest because it (a) violates a statute within the act's chapter; (b) violates a statute that contains a specific legislative declaration of public interest impact; or (c) injured or has the capacity to injure other persons. RCW § 19.86.093.

55. Defendant conducted their acts and practices as described herein during the course of trade or commerce.

56. Defendant's practices and acts in the marketing and sale of their Products were unfair and had a capacity to deceive and cause injury to Plaintiff, the Washington sub-class, and the public.

57. Defendant's Products were ineffective for treating nasal congestion and their Products were therefore misbranded.

58. Defendant indicated that their Products were effective in treating nasal congestion, as was indicated in their marketing materials, advertising, and promotional materials. This conduct has caused consumers confusion and misunderstanding as to the effectiveness of Defendant's Products.

59. Defendant knew or should have known that their marketing claims of effectiveness with respect to their oral phenylephrine products were false and misleading to Plaintiff, the

Washington sub-class, and the public.

60. Plaintiff, Washington Sub-Class Members and the members of the general public would not have purchased Defendant's oral phenylephrine products had they known about the Products' ineffectiveness in treating nasal congestion.

61. Plaintiff, Washington Sub-Class members, and members of the general public who have purchased Defendant's oral phenylephrine products have suffered economic loss in purchasing products that they believed were effective, when in reality, the Products were completely ineffective at treating nasal congestion.

62. Defendant's unfair and deceptive trade practices and acts were the proximate cause of Plaintiff's, Washington Sub-Class Member's, and additional members of the public that purchased Defendant's products injuries.

63. Additionally, violations of specific Washington commercial statutes, including the Washington Food, Drug, and Cosmetic Act, RCW § 69.04 are per se violations of the CPA.

64. Defendant is also in violation of the Washington Food, Drug, and Cosmetic Act ("WFDCA"), RCW § 69.04, therefore placing them in per se violation of the CPA., as the WFDCA is a specific legislative declaration of public interest or impact.

65. Washington's Food, Drug, and Cosmetic Act ("WFDCA") is to

> "Safeguard the public health and promote the public welfare by protecting the consuming public from (a) potential injury by product use; (b) products that are adulterated; or (c) products that have been produced under unsanitary conditions, and the purchasing public from injury by merchandising deceit flowing from intrastate commerce in food, drugs, devices, and cosmetics." RCW § 69.04.001.

66. The WFDCA prohibits "(1) the sale in intrastate commerce of any drug, device, or cosmetic that is adulterated or misbranded." RCW § 69.04.040.

67. Defendant is in violation of WFDCA because their Products are misbranded in that

Defendant's marketing and advertising of oral phenylephrine Products is false and misleading marketing.

68. Wherefore, Plaintiff and members of the Washington Sub-Class are entitled to injunctive and equitable relief, and a full refund in the amount they spent on the Products.

## SECOND CAUSE OF ACTION

### Negligent Misrepresentation

**(On Behalf of the Plaintiff and the Washington Sub-Class Against Defendant)**

69. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

70. Plaintiff brings this Count individually and on behalf of the Washington Sub-Class.

71. Washington law recognizes the tort of negligent misrepresentation and requires Plaintiff to show:

(1) the defendant supplied information for the guidance of others in their business transactions that was false, (2) the defendant knew or should have known that the information was supplied to guide the plaintiff in his business transactions, (3) the defendant was negligent in obtaining or communicating the false information, (4) the plaintiff relied on the false information, (5) the plaintiff's reliance was reasonable, and (6) the false information proximately caused the plaintiff damages. *Ross v. Kirner*, 162 Wn.2d 493, 499, 172 P.3d 701 (2007).

72. Defendant owed a duty of reasonable care to Plaintiff and the Sub-Class members in the marketing, advertising, sale, and distribution of their Products.

73. Defendant also had a duty to exercise reasonable care in properly and accurately representing the effectiveness of their Products to consumers, including Plaintiff and the Sub-Class members.

74. Defendant failed to exercise ordinary care when making the misrepresentations in

their marketing, advertising and promotional materials, claiming that their Products were effective.

75. Defendant negligently and falsely misrepresented facts regarding the effectiveness of their products to Plaintiff and the Sub-Class members.

76. Defendant knew or should have known that the misrepresentations of the effectiveness of their Products were false and misleading. Defendant knew or should have known that these misrepresentations would induce Plaintiff to purchase these Products in reliance of Defendant's claims.

77. Plaintiff's and Sub Class members' reliance on Defendant's misrepresentations was reasonable, as they had no reason to believe at the time of purchase that Defendant would have distributed false and misleading information about their Products.

78. As a direct and proximate cause of Defendant's negligent misrepresentations, Plaintiff and the Sub-Class members have suffered harm.

79. Defendant's misrepresentations were material and substantial factors in Plaintiff and Sub-Class members purchasing of and paying for the Products.

80. Defendant intended, or had reckless disregard, to induce Plaintiff and Sub-Class members to purchase their Products based on their misrepresentations of effectiveness. Plaintiff and Sub-Class members reasonably relied on the misrepresentations made by Defendant.

81. Wherefore, Plaintiff and members of the Washington Sub-Class are entitled to injunctive and equitable relief, and a full refund of the amount they spent on the Products.

### THIRD CAUSE OF ACTION

### Unjust Enrichment

**(On Behalf of the Plaintiff and the Washington Sub-Class Against Defendant)**

82. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

83. Plaintiff brings this Count individually and on behalf of the Washington Sub-Class.

84. Unjust enrichment is a method of recovery "for the value of the benefit retained absent any contractual relationship because notions of fairness and justice require it." *Young v. Young*, 164 Wn.2d 477, 484, 191 P.3d 1258 (2008).

85. Unjust enrichment occurs when (1) a plaintiff conferred a benefit upon the defendant, (2) the defendant had knowledge or appreciation of the benefit, and (3) the defendant's accepting or retaining the benefit without the payment of its value is inequitable under the circumstances of the case. *Young v. Young*, 164 Wn. 2d 477, 484-85 (Wash. 2008).

86. Defendant profited, and therefore benefitted, exponentially from their marketing and sales of their Products containing phenylephrine. Plaintiff and Sub-Class members were deprived of the money paid for these ineffective Products.

87. Defendant was unjustly enriched by unlawfully receiving money from Plaintiffs for ineffective Products. It would be inequitable and unconscionable for Defendant to retain the compensation obtained based on their wrongful conduct.

88. Wherefore, Plaintiff and members of the Washington Sub-Class are entitled to injunctive and equitable relief, and a full refund in the amount they spent on the Products as well as an order from this Court requiring the disgorgement of all profits, benefits, and additional compensation obtained by Defendant by way of their wrongful conduct.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of herself and all others similarly situated, pray for judgment against the Defendant as to each and every count, including:

A. An order declaring this action to be a proper class action, appointing Plaintiff and her counsel to represent the Class/Sub-Classes, and requiring Defendant to bear the costs of class notice;

B. An order enjoining Defendant from selling the Products;

C. An order enjoining Defendant from suggesting or implying in their marketing and advertising that their Products are effective as a nasal decongestant;

D. An order requiring Defendant to engage in a corrective advertising campaign and engage in any further necessary affirmative injunctive relief, such as recalling existing Products;

E. An order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining Defendant from continuing the unlawful practices alleged herein, and injunctive relief to remedy Defendant's past conduct;

F. An order requiring Defendant to pay restitution/damages to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, untrue or misleading advertising in violation of the above-cited authority, plus pre- and post-judgment interest thereon;

G. An order requiring Defendant to disgorge any ill-gotten benefits received from Plaintiff and members of the Class/Sub-Classes as a result of any wrongful or unlawful act or practice;

H. An order requiring Defendant to pay all actual and statutory damages permitted under the counts alleged herein;

I. An order awarding attorneys' fees and costs to Plaintiff and the Class/Sub-Classes; and

J. An order providing for all other such equitable relief as may be just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

DATED: October 19, 2023

By: /s/ Chelsie Warner
**AYLSTOCK, WITKIN,**
**KREIS & OVERHOLTZ, PLLC**
Chelsie Warner (WA Bar 52451)
17 East Main Street, Suite 200
Pensacola, FL 32502
Telephone: 850-202-1010
Facsimile: 850-916-7449
E-mail: cwarner@awkolaw.com

Jacob R. Rusch (MN Bar No. 0391892)
**JOHNSON BECKER PLLC**
444 Cedar Street, Suite 1800
St. Paul, MN 55101
(612) 436-1800 (phone)
(612) 436-4801 (fax)
jrusch@johnsonbecker.com

*Attorneys for Plaintiff*